IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MELISSA ANN BRAGG, | ) | Case No. 1:20-cv-378 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

## I.    Introduction

Plaintiff, Melissa Ann Bragg, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 11; ECF Doc. 12.  Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Bragg's applications for DIB and SSI must be AFFIRMED.

## II.   Procedural History

On June 15, 2016, Bragg applied for DIB and SSI.  (Tr. 197-212).[1]  Bragg alleged that she became disabled on October 1, 2015, due to: "1. High Blood Pressure, 2. Peripheral

---

[1] The administrative transcript appears in ECF Doc. 9.

Neuropathy, 3. Diabetes, 4. Pituitary Tumor, [and] 5. Cushing's Disease."  (Tr. 212, 235).  The Social Security Administration denied Bragg's applications initially and upon reconsideration. (Tr. 51-110).  Bragg requested an administrative hearing.  (Tr. 140-41).  ALJ Joseph Hajjar heard Bragg's case on September 28, 2018 and denied the claims in a January 28, 2019 decision.  (Tr. 12-50).  On December 18, 2019, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6).  On February 19, 2020, Bragg filed a complaint to obtain judicial review.  ECF Doc. 1.

**III.    Evidence**

**A.    Personal, Educational, and Vocational Evidence**

Bragg was born on July 21, 1979, and she was 36 years old on the alleged onset date. (Tr. 197).  Bragg completed the 11th grade and she did not have a GED.  (Tr. 40).  She had past work as a nurse assistant.  (Tr. 41, 237).

**B.    Relevant Medical Evidence**

On March 30, 2016, Bragg went to the emergency room with right flank pain that radiated to her back and a possible UTI.  (Tr. 395).  Bragg said that she had not been taking her daily medications and that muscle relaxants did not help.  (Tr. 395).  On examination, David Brown, MD, noted that Bragg had a regular heart rhythm, normal range of motion, normal behavior, and normal mood/affect.  (Tr. 397).  Dr. Brown also noted that CT of Bragg's abdomen and pelvis showed a small nonspecific focus of haziness in the fat anterior to the mid descending colon that might represent a small focus of epiploic appendagitis; fat-containing umbilical hernia; fatty infiltration of the liver; a 2.9cm focus of the slight increased attenuation in the right lobe of the liver, a 5.9mm nonobstructing calculus in the interpolar region of the left kidney; a tiny nonobstructing calculus in the lower pole of the left kidney, right adrenal

myelolipoma, and a prior cholecystectomy.  (Tr. 398).  Christopher Randolph, DO, noted that an EKG showed normal results.  (Tr. 399).

On April 2, 2016, Bragg told James Cohen, MD, that she had back pain and a rash on her lower back.  (Tr. 392).  Bragg also asked for a Percocet refill.  (Tr. 392).  Bragg rated her pain as "mild," said it was constant, and said narcotics relived it.  (Tr. 392).  On examination, Dr. Cohen noted that Bragg had a normal heart rate, normal range of motion, normal behavior, normal judgment, and normal thought content.  (Tr. 394).  Dr. Cohen diagnosed Bragg with Pruritus and uncontrolled hypertension and prescribed Zyrtec for Bragg's reported itching.  (Tr. 394).

On April 6, 2016, Bragg told Matthew Ahern, MD, that her back pain was worse and that medication (Motrin) and muscle relaxers did not help.  (Tr. 388).  Bragg denied having any lower or upper extremity weakness.  (Tr 389).  On examination, Bragg had a normal heart rate, normal range of motion, 5 out of 5 extremity strength, and pain in the right perithoracic spinal erector muscles and right scapula.  (Tr. 390).  Dr. Ahern noted that a CT and x-ray showed no acute findings.  (Tr. 390).  Dr. Cohen also noted that Dilaudid relieved Bragg's pain, and that she admitted not taking her insulin.  (Tr. 391).  Dr. Cohen recommended that Bragg resume her normal insulin regimen and referred her for physical therapy.  (Tr. 391).  Dr. Cohen diagnosed Bragg with right perithoracic muscle strain, hyperglycemia, and noncompliance with insulin.  (Tr. 391).

On April 10, 2016, Bragg told Paul Marrow, PA-C, that she had gone to the emergency room for back pain three times, but she did not follow up because she had lost her insurance.  (Tr. 383).  Bragg said that she was diagnosed with a muscle strain and "usually give[n]" Dilaudid.  (Tr. 383).  Brag rated her pain as a 10 out of 10, said it never went away, said it was worse with certain movements, and said her pain caused nausea and vomiting.  (Tr. 383).

3

Marrow noted that multiple blood work and CAT scans were all normal.  (Tr. 383).  On examination, Bragg had a normal heart rate and rhythm, normal breath sounds, diffused trapezius tenderness on the right side, ability to move all her extremities well, no swelling, no erythema, normal behavior, normal mood/affect, and normal judgment/thought content.  (Tr. 385).  Morrow diagnosed Bragg with muscle strain, directed her to follow up regarding lab and radiology results, and discharged her in "improved and stable" condition.  (Tr. 386).

On April 14, 2016, Vishal Vashistha, MD, noted that CT scans and blood work were unremarkable, and that Bragg's pain was "treated conservatively with Percocet and zanaflex." (Tr. 381).  Dr. Vashistha noted that Bragg was uncomfortable with hypertension and tachycardia, and that she wanted direction for pain.  (Tr. 381).  Dr. Vashistha gave Bragg NSAID patches, refilled her Percocet, increased her Zanaflex, and referred her to orthopedics and physical therapy.  (Tr. 382).

On April 7, 2016, Bragg went back to the ER with right side pain, which she said was exacerbated by movement and palpation.  (Tr. 376).  Eoin Donnellan, MD, noted that Bragg was "very poorly compliant with her medications" and had elevated blood pressure.  (Tr. 377). Examination showed that Bragg had normal range of motion, normal heart rate and rhythm, and normal breathing.  (Tr. 378).  Dr. Donnellan recommended that Bragg follow up with pain management, recommended she use NSAIDs with her opioid medication, and prescribed diazepam.  (Tr. 379).

On April 18, 2016, Bragg saw Patricia Kilbane, RN, for back pain and right shoulder pain.  (Tr. 372).  Bragg said that Percocet eased the pain but did not last long.  (Tr. 372).  On examination, Bragg had a normal gait, no symptoms in her lower extremities, diffused tenderness on palpation over bilateral intrascapular muscle area, full range of motion, and normal sensation.

4

(Tr. 375). She also had a depressed mood and anxious affect. (Tr. 375). Nurse Kilbane recommended tobacco cessation, weight loss, diet, exercise, consistent sleep, and controlled glucose levels. (Tr. 375). Nurse Kilbane also noted that, because she could not provide any pain medication, Bragg asked to be sent to the ER. (Tr. 375).

On April 25, 2016, Bragg went to the ER with right shoulder pain radiating to her spine and other shoulder. (Tr. 335). On examination, Yazeed Swalha, MD, noted that Bragg had tenderness in her thoracic vertebrae, clear lungs, normal cardiac function, and no noted symptoms in her extremities. (Tr. 355). Dr. Swalha noted that Bragg was calm and cooperative initially, but she became "agitated when [she] discussed pain management." (Tr. 355). Specifically, Bragg said that nothing helped her pain except IV Dilaudid and "got furious and agitated . . . when told IV Dilaudid is not for chronic pain." (Tr. 335). Dr. Swalha also noted that Bragg was advised to get PT and yoga for her pain. (Tr. 353).

On April 26, 2016, Raghavendra Reddy Allareddy, MD, noted that Bragg's Cushing's syndrome and hyperthyroidism were "normal, on thyroxine" as of April 16, 2016. (Tr. 356). Dr. Allareddy noted that Bragg reported right shoulder pain radiating to her spine and other shoulder, but a CT did not show any abnormalities. (Tr. 356). Bragg said that she had been compliant with her medication for the previous two days, but she might have missed doses before that. (Tr. 357). Examination showed that Bragg was "[n]ot in pain or respiratory distress," appeared agitated, and had no suggestion of depression/neurosis. (Tr. 357).

On April 26, 2016, Jonas Reid, MD, saw Bragg for a spine surgery consultation. (Tr. 358). Dr. Reid noted that CTs had "essentially normal" results and did not explain her upper back pain. (Tr. 358). Dr. Reid also noted that Bragg did not have any weakness or numbness in her extremities. (Tr. 358). Examination showed full range of motion, 5/5 strength in all upper

5

extremities/shoulders and lower extremities, and calm/cooperative behavior.  (Tr. 359-60).  Dr. Reid determined that there was "[n]o acute intervention warranted," and recommended that Bragg follow up with her PCP, pain management, or spine medicine clinic.  (Tr. 360).

On April 27, 2016, Garrett LaSalle, MD, saw Bragg for a pain management consultation. (Tr. 361).  Dr. LaSalle recommended discontinuation of all opioids because they were not optimal for musculoskeletal pain treatment and gave her IV acetaminophen, vitamin D, and gabapentin.  (Tr. 361).  Dr. LaSalle also recommended PT/OT to help with her pain.  (Tr. 361). Dr. LaSalle noted that Bragg denied having any lower extremity weakness, incontinence, or wide-based gait.  (Tr. 361).

On April 27, 2016, Jahangir Maleki, MD, saw Bragg for a pain management consultation. (Tr. 363).  Dr. Maleki noted that Bragg reported severe pain across her right media scapular border.  (Tr. 363).  Bragg denied upper extremity, lower back, and lower extremity pain, but Dr. Maleki said that it later became clear that Bragg had chronic back pain issues and lower extremity numbness and pain.  (Tr. 363).  On examination, Dr. Maleki noted that Bragg had an anxious and depressive affect, no palpation pain on her right upper parathoracic muscles and subcutaneous tissue over her right scapula, palpation pain over her right trap and entire lumbar region extending into her hips, and increased spinal pain with range of motion.  (Tr. 365).  Dr. Maleki recommended chronic pain rehabilitation and prescribed Cymbalta.  (Tr. 365).

On April 29, 2016, Gregory Rutecki, MD, explained to Bragg that he could not assist her with narcotics for pain and that she needed to follow through with pain management.  (Tr. 351).

On May 4, 2016, Bragg called the hospital and told Sarah Kelly, MA, that she was on too many medications, that her medication caused her to hallucinate and "not to function right," and that she would follow up with pain management on May 5, 2016.  (Tr. 347).  Bragg's May 5,

2016 appointment was cancelled because it was incorrectly scheduled, and Bragg was directed to schedule a follow-up appointment with the neuro institute.  (Tr. 347).

On May 7, 2016, Bragg went to the ER for back pain.  (Tr. 1093).  Mark Grimes, MD, noted that Bragg had chronic pain syndrome and pain in her thoracic spine.  (Tr. 3950.  Bragg also said that she had edema in her foot and denied any tingling or numbness in her extremities. (Tr. 1096).  Examination showed regular heart rate, clear lungs, no erythema, tenderness in the midline and paraspinal plains throughout the thoracic spine, normal motor senses, symmetric reflexes, strong equal peripheral pulses, and normal Babinski's bilaterally. (Tr. 1096-97).  Dr. Grimes noted that labs were unremarkable and that CTs showed no acute findings, but there was mild discogenic degenerative changes in the mid to lower thoracic spine and minimal discogenic degenerative changes without evidence of central canal or neural foraminal narrowing.  (Tr. 1097, 1101-04).  Dr. Grimes noted that Bragg received Dilaudid and Zofran, which reduced her pain.  (Tr. 1097).

On June 15, 2016, Bragg went to the ER with upper back pain and shortness of breath. (Tr. 341).  Bragg rated her pain as a 10 out of 10, said that nothing made it better or worse, and said that her pain was so intense that it caused her shortness of breath, a headache, and elevated blood pressure.  (Tr. 341).  Bragg denied tingling or numbness in her extremities, leg pain, or swelling.  (Tr. 341).  Pain said that she used to take "Perc 10," but her doctor stopped the medication because she was supposed to go to pain management and her pain management appointment was rescheduled.  (Tr. 341).  On examination, Erin Bender, PA-C, noted that Bragg had normal range of motion, tenderness in her thoracic back with pain and spasm, normal mood/affect, normal behavior, and normal judgment/thought content.  (Tr. 343).  Bender diagnosed Bragg with chronic thoracic back pain.  (Tr. 344).

On June 28, 2016, Bragg told Samantha Brigotti, CNP, that she had chronic pain, was given gabapentin, and wanted to change to Lyrica.  (Tr. 339).  Bragg said that her back pain was similar to what it had been in the past, that she was not seeing a physical therapist, and that she did not have pain or numbness in her legs.  (Tr. 339).  Examination showed regular heart rate and rhythm, clear lungs, tenderness in the right shoulder, inability to raise arms above the head, and full strength bilaterally.  (Tr. 340).  Nurse Brigotti prescribed Lyrica and Flexeril.  (Tr. 340).

On July 1, 2016, Bragg told George Feyda, MD, that she was out of gabapentin and wanted a refill.  (Tr. 336).  Dr. Feyda noted that Bragg said she was taking more than the recommended amount and discussed using only approved dosing for safety.  (Tr. 336).  Dr. Feyda also noted that a CT showed hepatomegaly and increased fatty liver.  (Tr. 336).  Bragg's diabetes was also poorly controlled.  (Tr. 336).  Bragg was cooperative.  (Tr. 337).  Dr. Feyda referred Bragg to hepatology and endocrinology for a follow up.  (Tr. 337).

On July 24, 2016, Bragg told Morgan Koepke, MD, and John Thomas, PA-C, that she had chest pain and right thoracic back pain that radiated into her chest.  (Tr. 490, 495).  Bragg also said that she had numbness and burning on the right side of her chest, that she was told her diabetic neuropathy and a pinched nerve might be responsible for her pain, and that her gabapentin did not help the burning pain in her chest.  (Tr. 490, 495).  Dr. Koepke noted that a chest x-ray showed no active infiltrate or vascular congestion and an EKG demonstrated sinus tachycardia with possible left strial enlargement and evidence of LVH.  (Tr. 491).  Dr. Koepke noted that Bragg's blood pressure improved significantly after she was given lisinopril, her blood sugar improved with insulin, and she was vague about her compliance with these medications.  (Tr. 491).  Dr. Koepke noted that Bragg's "biggest request all evening was to receive more Dilaudid."  (Tr. 491).  On examination, Bragg had a regular heart rate, clear lungs, morbid

obesity, trace edema in her lower extremities, and tenderness to palpation on her chest wall.  (Tr. 492, 496).  Dr. Koepke diagnosed Bragg with chronic chest wall pain radiating from the back, morbid obesity, uncontrolled diabetes mellitus, poorly controlled hypertension, untreated severe hypercholesterolemia and hypertriglycerimia, hypothyroidism, Cushing's disease, potential hypopituitarism, dehydration, severe hyperglycemia, and tobacco abuse.  (Tr. 493-94).  Dr. Koepke encouraged Bragg to comply with her usual home medications.  (Tr. 494).  An extremity venous duplex scan showed no evidence of DVT.  (Tr. 508).

On September 2, 2016, Bragg saw Shanna Gnew, RN, for diabetic self-management education.  (Tr. 1229).  Bragg said that she experienced neuropathy daily as a result of uncontrolled diabetes and that she checked her blood glucose levels four times per day before every meal.  (Tr. 1230).  Nurse Gnew also educated Bragg on the role of exercise and healthy diet.  (Tr. 1230).  Bragg told nurse Gnew that she had "not been very mobile since [M]arch due to back problems."  (Tr. 1230).

On September 11, 2016, Bragg told Melanie Golembiewski, MD, that she had right shoulder pain radiating to her spine and other shoulder.  (Tr. 1259).  Dr. Golembiewski noted that a CT showed no abnormalities and that Bragg was advised to get physical activity and yoga.  (Tr. 1259).  Dr. Golembiewski noted that Bragg "got furious and agitated when told IV Dilaudid is not for chronic pain," and she offered Bragg to double the dose of gabapentin and add oxycodone.  (Tr. 1259).  At a follow-up on September 12, 2016, Dr. Golembiewski gave Bragg new medication.  (Tr. 1225, 1245).

On November 10, 2016, Bragg went to the ER with left groin pain and swelling.  (Tr. 669).  On examination, Shaila Karan, MD, and Peter Carrillo, MD, noted that Bragg had normal lung sounds, regular heart rate and rhythm, no edema or cellulitis in her extremities, normal

9

extremities, and an anxious psychiatric condition.  (Tr. 671-72, 719).  Dr. Karan and Dr. Carrillo determined that Bragg had sepsis due to a perianal abscess, UTI, hyponatremia, tachycardia, and diabetic ketoacidosis.  (Tr. 672, 719).  Dr. Karan and Dr. Carrillo prescribed aggressive IV fluids, IV Dilaudid, vancomycin, and Zosyn.  (Tr. 672, 719).  Dr. Carrillo performed an incision and drainage of the perineal abscess under general anesthesia.  (Tr. 725).

On November 11, 2016, Bragg saw Akhilesh Rao, MD, for a consultation after lactic acidosis, hypotension, and hyponatremia were noted during her ER visit.  (Tr. 675).  Dr. Rao noted that Bragg was hyperglycemic, hypotensive, was not making much urine, and had elevated creatinine.  (Tr. 675).  Dr. Rao noted that Bragg had diabetes for 12 years and a previous acute kidney injury.  (Tr. 675).  Bragg reported having anxiety and back pain.  (Tr. 696).  On examination, Bragg had normal lungs, regular heart rate and rhythm, leg edema, and anxiety. (Tr. 698).  Dr. Rao diagnosed Bragg with acute kidney injury, hyponatremia, lactic acidosis, Cushing's disease, hypokalemia, and hypothyroidism.  (Tr. 698-99).  Dr. Rao gave Bragg IV saline to balance her electrolytes.  (Tr. 699).

On November 28, 2016, Bragg saw Dr. Golembiewski for a follow-up after her ER visit. (Tr. 1223).  Dr. Golembiewski noted that Bragg's blood sugar was over 500 and she had high blood pressure after she was taken off lisinopril.  (Tr. 1223).  Bragg also had an abnormal lung CT scan.  (Tr. 1223).  Dr. Golembiewski prescribed lisinopril and duloxetine, and she discontinued Bragg's Effexor prescription.  (Tr. 1224).

On July 19, 2017, Bragg was taken to the ER after paramedics were dispatched to her address based on reports that she passed out, had recurrent falls, and had weakness.  (Tr. 1377, 1409).  Mohammad Annaba, MD, noted that Bragg had been diagnosed with UTI and had dysuria.  (Tr. 1377).  Examination showed normal respiration, regular heart rate and rhythm, no

noted musculoskeletal symptoms, no agitation, normal reflexes, and no extremity edema.  (Tr. 1379).  Dr. Annaba diagnosed Bragg with acute UTI, sepsis, acute kidney injury, controlled diabetes, chronic hypothyroidism, Cushing's syndrome, and morbid obesity.  (Tr. 1380-81).  Bragg was given IV fluids for her renal failure until she left against medical advice.  (Tr. 1374).

On September 26, 2017, Bragg saw Christine Williams, APRN, for a diabetes follow up and prescription refill.  (Tr. 1649).  Bragg told nurse Williams that she also had painful urination.  (Tr. 1649).  Bragg also said that she had blurred vision, shortness of breath, diaphoresis, malaise/fatigue, joint pain, myalgias, dysuria, and anxiety.  (Tr. 1650).  Examination showed normal range of motion, regular heart rate and rhythm, normal breathing, edema in her lower extremities, and normal mood and affect.  (Tr. 1652).  Nurse Williams noted that Bragg had good joint mobility in her feet.  (Tr. 1652).

On September 27, 2017, Bragg went to the ER and said that her PCP had told her that she had abnormal labs, was dehydrated, and had malfunctioning kidneys.  (Tr. 1419).  Bragg had a steady gait, was unable to identify what labs were abnormal, reported generalized weakness and dizziness, was alert and oriented, and had easy respiration.  (Tr. 1419).  Bragg also had no complaints of pain.  (Tr. 1419).  Bragg denied knowledge of any renal disease history.  (Tr. 1420).  Examination showed normal respiration, no pain, full orientation, normal back without tenderness, normal extremities, normal range of motion, normal affect, normal judgment, normal recent and remote memory, normal concentration, and steady gait.  (Tr. 1421-22).  Yulia Artemenko, RN, noted that although Bragg's kidneys were not working as well as the should, they were still managing to do their job and she could be safely discharged to home.  (Tr. 1429).

On October 17, 2017, Stephanie Ladson-Wofford, MD, noted that Bragg had a history of CKD stage 4, diabetes, hypertension, and tachycardia.  (Tr. 1601).  Dr. Ladson-Wofford noted

11

that Bragg was unemployed, had "no impairment," had a history of smoking, and had difficulty with chronic lower extremity edema.  (Tr. 1601-02).  On examination, Bragg had regular heart rate and rhythm, clear lungs, alert and oriented constitution, and obesity.  (Tr. 1603).  Dr. Ladson-Wofford continued Bragg's medications and ordered labs.  (Tr. 1604).  At a follow-up on January 29, 2018, Dr. Ladson-Wofford noted that Bragg reported back pain, joint pain, shoulder pain, and weakness in her arms.  (Tr. 1593-94).  Bragg said Tylenol did not help her pain.  (Tr. 1594).  Dr. Ladson-Wofford noted that Bragg's blood sugar was high.  (Tr. 1595).  Dr. Ladson-Wofford continued Bragg's medications, added amlodipine and ergocalciferol, and referred Bragg to an IM group and hematologist.  (Tr. 1598).

On February 13, 2018, Bragg saw Preethi Krishnan, MD, for diabetes management.  (Tr. 1623).  Dr. Krishnan noted that Bragg had poor compliance with her diet and no set exercise regimen.  (Tr. 1623).  Bragg reported fatigue, low energy, sleep disturbance, blurry vision, swelling in her ankles and feet, a cough, diarrhea, back and joint pain, muscle cramps, weakness, joint swelling, numbness, tingling, and depression.  (Tr. 1624-25).  On examination, Bragg had obesity, normal respiration, regular heart rate and rhythm, no edema, palpable distal pulses, and appropriate affect.  (Tr. 1626).  Dr. Krishnan recommended that Bragg diet, exercise, and lose weight.  (Tr. 1626).

On February 20, 2018, Bragg told Melissa Tripoli, MD, that she had blurred vision at distance.  (Tr. 1264).  Bragg said he had trouble seeing things on the TV and street signs, and she had glare issues that prevented her from driving at night.  (Tr. 1264).  Dr. Tripoli determined that Bragg had severe diabetic retinopathy and referred her for continued care.  (Tr. 1267-68).

On March 14, 2018, an MRI showed a 3x3mm region of contrast enhancement at the inferior terminal of the pituitary stock.  (Tr. 1473).  Joseph Fondriest, MD, determined that the

finding could represent pituitary tissue spared of her initial pituitary tumor surgery and that pituitary nodule or postsurgical change might have had similar findings.  (Tr. 1472-73).

On March 16, 2018, Mitchel Opremcak, MD, evaluated Bragg's retinopathy.  (Tr. 1355). On examination, there was no evidence of macular edema or subretinal fluid, vitreous separation consistent with a posterior vitreous detachment, mild leakage consistent with neovascularization, scattered retinal hemorrhages, and hypofluorescence consistent with capillary nonperfusion.  (Tr. 1356).  Dr. Opremcak diagnosed Bragg with moderate proliferative diabetic retinopathy, retinal exudates, and senile cataract.  (Tr. 1356).  He recommended light pan-retinal laser to decrease risk or long-term vision loss and explained that there would be less risk of vision loss if Bragg controlled her blood sugars.  (Tr. 1356).  Dr. Opremcak performed the light pan-retinal laser procedure on March 20, 2018 and noted that Bragg tolerated the procedure well.  (Tr. 1367-69).

On March 25, 2018, Bragg called 911 with complaints that she had high blood sugar. (Tr. 1475).  After paramedics arrived, they found that her blood glucose level was 86, and Bragg said that she had a headache and was "afraid [her] pituitary gland [was] going to rupture."  (Tr. 1475).  Paramedics determined that Bragg's condition was "non emergent" and transported her to a hospital.  (Tr. 1476).  At the ER, Bragg said that she also had chest tightness, felt weak and dizzy when she stood up, had shortness of breath, and had severe nausea.  (Tr. 1491-92).  On examination, there was no evidence of respiratory distress.  (Tr. 1493).  Bragg had regular heart rate and rhythm, no tenderness in her back, full orientation, normal speech, no motor deficits, normal eye functions, steady gait, cooperative behavior, and normal affect.  (Tr. 1493, 1495). Labs showed no symptoms.  (Tr. 1494).  It was determined that Bragg had "mild dehydration," she improved with IV fluid treatment, and she was discharged home.  (Tr. 1494, 1496).

On March 30, 2018, Bragg told Dr. Golembiewski that she had depression and anxiety and that she was looking for an apartment because her boyfriend left her.  (Tr. 1644).  Bragg denied having any breathing issues, chest pain, fatigue, or weakness, but she said that she had heartburn and myalgias.  (Tr. 1646).  Examination showed normal range of motion, normal heart rate and rhythm, obesity, normal breathing, no edema, normal mood and affect, and normal behavior.  (Tr. 1646).  Dr. Golembiewski continued Bragg's treatment with medications.  (Tr. 1647-48).

On April 20, 2018, Bragg saw Anne Tyler, LPCC, for a behavioral health assessment on referral from Dr. Golembiewski.  (Tr. 1637-38).  Bragg told Tyler that she had anxiety and depression, which began a month before her assessment after her finance had kicked her out with no explanation.  (Tr. 1638).  Bragg said she had a decreased appetite, difficulty concentrating, and difficulty focusing on daily activities.  (Tr. 1638).  Bragg said she had "a lot of trouble being away from [her] dog," and that she had panic attacks.  (Tr. 1639).  On examination, Bragg was cooperative, in "moderate distress," and fully oriented.  (Tr. 1642).  She had normal behavior, appropriate hygiene, appropriate expression, appropriate speech, depressed and tearful mood, appropriate organization of thoughts, appropriate thought content, clear and normal attention/concentration, normal recent and remote memory, appropriate abstract reasoning, and fair insight/judgment.  (Tr. 1642-43).  Bragg also had feelings of hopelessness, worry, and worthlessness.  (Tr. 1642).  Tyler diagnosed Bragg with adjustment disorder and recommended behavioral health therapy to cope with anxiety and stress.  (Tr. 1643).

On May 18, 2018, Dr. Golembiewski noted that Bragg needed to establish care with an endocrinologist and had extreme hypertriglyceridemia.  (Tr. 1634, 1636).  Bragg said that her meeting with Tyler had been helpful.  (Tr. 1634).  On examination, Bragg was obese, had facial

14

swelling due to  dental procedure, had normal range of motion, had a normal heart rate and

rhythm, had normal breathing, had no edema, and had normal mood, affect, and behavior.  (Tr.

1635-36).

On May 22, 2018[2], Bragg saw Tyler for behavioral health counseling to address her

adjustment disorder, mixed anxiety, and depressed mood.  (Tr. 1631).  Tyler noted that Bragg

had normal thought process and content, was cordial and cooperative, was calm, had normal

speech, had thoughtful and logical judgment, was able to verbalize her feelings and thoughts, and

had fair insight.  (Tr. 1632).  Tyler noted that Bragg was engaged with treatment, openly shared

with the clinician, used the session effectively, and was open to feedback and support.  (Tr.

1633).

On August 2, 2018, Bachar Dergham, MD, noted that Bragg's bloodwork revealed

thrombocytopenia.  (Tr. 1670).  Bragg denied any easy bruisability, bleeding abnormalities

epistaxis, or gingival bleeding.  (Tr. 1670).  Examination showed that Bragg had morbid obesity,

pleasant attitude, clear lungs, no tenderness, no edema in her extremities, and no cyanosis.  (Tr.

1673).  Dr. Dergham determined that there was no clear etiology for Bragg's thrombocytopenia

and ordered a bone marrow aspiration and biopsy and ultrasound.  (Tr. 1673).  Dr. Dergham also

determined that Bragg had mild leukocytosis.  (Tr. 1673).  On August 17, 2018, Bragg's

ultrasound indicated hepatomegaly and hepatic steatosis.  (Tr. 1685).  On August 20, 2018, Dr.

Dergham performed the bone marrow aspiration and biopsy.  (Tr. 1687, 1692).  On September 6,

2018, Dr. Dergham determined that the bone marrow biopsy showed normocellular marrow with

adequate megakaryocytes.  (Tr. 1696).  Dr. Dergham noted that Bragg was asymptomatic and

had clear lungs, no tenderness, no edema, and no cyanosis.  (Tr. 1696).  Based on Bragg's

---

[2] Bragg's brief indicates that this treatment record was dated September 26, 2017.  ECF Doc. 14.  It was
not.  (Tr. 1631).

ultrasound, Dr. Dergham determined that Bragg's thrombocytopenia was likely secondary to sequestration and referred Bragg to hepatology for management.  (Tr. 1696-97).

### C.    Relevant Opinion Evidence

#### 1.    Treating Physician – Melanie Golembiewski, MD

On March 14, 2017, Dr. Golembiewski completed a "physical assessment" form.  (Tr. 1261-62).  Dr. Golembiewski said that Bragg's impairments would frequently interfere with her attention and concentration, and she would need to recline, lie down, or take an unscheduled break every 15 minutes outside of the normal workday breaks.  (Tr. 1261).  Dr. Golembiewski said that Bragg could walk for less than 1 city block without rest, sit for up to 1 hour in an 8-hour workday, and stand/walk for up to 15 minutes.  (Tr. 1261).  Dr. Golembiewski said that Bragg could never lift less than 10 pounds or more.  (Tr. 1261).  Bragg had restricted reaching, handling, and fingering.  (Tr. 1261).  She could grasp/turn/twist objects, perform fine manipulation, and reach for up to 10% of the workday each.  (Tr. 1261).  Dr. Golembiewski also said that Bragg would be absent more than four times per month.  (Tr. 1262).

#### 2.    Consultative Psychological Examiner – Mitchell Wax, Ph.D.

On December 12, 2016, consultative psychological examiner Mitchell Wax, Ph.D., examined Bragg and evaluated her mental residual functional capacity.  (Tr. 1252-57).  Bragg told Dr. Wax that she had depression and anxiety and lived in a duplex with her fiancé.  (Tr. 1252-53).  Bragg said that she dropped out of school in the 11th grade because she was pregnant, but she had no difficulty getting along with teachers or other students while she was in school.  (Tr. 1253).  Bragg said that she had no prior psychiatric hospitalizations or care.  (Tr. 1253).  Bragg said that she previously worked as a nursing assistant, but she was laid off without explanation.  (Tr. 1254).  Bragg said that she was probably taking too much time off work, and

16

she had no difficulty getting along with coworkers, supervisors, or patients when she was

working.  (Tr. 1254).  Bragg said that she slept days and stayed awake at night to spend time

with her fiancé, cooked three full meals a week, bathed daily, did dishes daily, watched TV for

up to 9 hours a day, read a book a week, grocery shopped with her fiancé, and talked to her

sisters and mother daily.  (Tr. 1254).  Bragg said that she did not shop in stores for long periods

of times because her feet hurt, and she was anxious.  (Tr. 1254).

Dr. Wax determined that Bragg had good social skills and was polite.  (Tr. 1255).  She

had no noted irritability/anger or autonomic signs of anxiety during the examination, but she

reported that she got angry twice a week and had panic attacks three times a week. (Tr. 1255).

Dr. Wax determined that Bragg had average intelligence, no evidence of confusion, good

concentration, good flow of conversation and thought, and no delusions or hallucinations.  (Tr.

1255).  Dr. Wax opined that Bragg would be able to understand, remember, and carry out

instructions on a job.  (Tr. 1256).  Bragg would be able to maintain attention and concentration.

(Tr. 1257).  Dr. Wax said that Bragg would not respond appropriately to supervisors and

coworkers or respond appropriately to work pressures due to frequent fatigue.  (Tr. 1257).

### 3.    State Agency Consultants

On September 9, 2016, state agency medical consultant Gail Mutchler, MD, evaluated

Bragg's physical capacity based on a review of the medical records.  (Tr. 55-60).  Dr. Mutchler

determined that Bragg had the medically determinable impairments of essential hypertension,

degenerative disc disorder, diabetes mellitus, and other unspecified arthropathies.  (Tr. 55).  Dr.

Mutchler noted that Bragg's reported pain was consistent with the medical evidence, but her

reported weakness was inconsistent because records showed 5/5 strength throughout.  (Tr. 56).

Dr. Mutchler said that Bragg could lift up to 20 pounds occasionally and 10 pounds frequently,

stand and/or walk for up to 6 hours in an 8-hour workday, sit for up to 6 hours in an 8-hour workday, and pus and/or pull without limitation.  (Tr. 56).  Bragg could frequently climb ramps, climb stairs, and crouch; occasionally stoop and crawl; never climb ladders, ropes, and scaffolds; and balance and kneel without limitation.  (Tr. 57).  Bragg had limited overhead reaching and unlimited handling, fingering, and feeling.  (Tr. 57-58).  She had no visual or communitive limitations.  (Tr. 58).  Bragg needed to avoid moderate exposure to hazards such as machinery and heights, but she had no other environmental limitations.  (Tr. 58).  Based on these findings, Dr. Mutchler determined that Bragg was able to perform light work.  (Tr. 60).  On December 14, 2016, Leigh Thomas, MD, concurred with Dr. Mutchler's opinion.  (Tr. 84-87).

On December 23, 2016, state agency psychology consultant Cynthia Waggoner, Psy.D., evaluated Bragg's mental capacity.  (Tr. 82-83, 87-89).  Dr. Waggoner noted that Bragg had affective disorders and anxiety-related disorders.  (Tr. 82).  Bragg had "mild" daily living activity restrictions, moderate social functioning difficulties, and moderate difficulty maintaining concentration, persistence, and pace.  (Tr. 82).  Dr. Waggoner determined that Bragg had no limitations in understanding and memory.  (Tr. 87).  Bragg had moderately limited ability to carry out detailed instructions, maintain attention and concentration for extended periods, ability to complete a normal workday without interruptions from psychologically based symptoms, and ability to perform ant a consistent pace without an unreasonable number and length of rest periods.  (Tr. 87-88).  She was not significantly limited in carrying out short and simple instructions, sustaining an ordinary routine without special supervision, working in coordination or in proximity to others without being distracted, and making simple work-related decisions.  (Tr. 87-88).  Bragg had moderate limitations in interacting appropriately with the general public, accepting instructions, and responding appropriately to supervisor criticism.  (Tr. 88).  Dr.

18

Waggoner said that Bragg was not significantly limited in asking questions, requesting assistance, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintaining appropriate behavior.  (Tr. 88).  Bragg had moderate limitations in responding appropriately to changes in the workplace, but she was not significantly limited in being aware of normal hazards, taking appropriate precautions, traveling in unfamiliar places, using public transportation, setting realistic goals, and making independent plans.  (Tr. 88-89).

### D.    Relevant Testimonial Evidence

Bragg testified at the ALJ hearing.  (Tr. 39-45).  Bragg said that she lived with her sister and her sister's fiancé.  (Tr. 39).  She said that she no longer had a driver's license because she couldn't feel car pedals due to her neuropathy and she had trouble seeing at night.  (Tr. 40).  Bragg said that she did not take public transportation because it was hard to stand on a bus and she needed assistance walking.  (Tr. 41).  In a typical day, Bragg would wake up, take a shower, take her medicine, eat breakfast, walk outside, sit on the patio with her sister, watch TV, check her sugar, and go to bed.  (Tr. 44).  Bragg said that she had trouble getting dressed due to her shoulder pain, and she could not do her own laundry.  (Tr. 44).  She said she did not do any chores, have any hobbies, or volunteer anywhere.  (Tr. 44-45).

Bragg said that she last worked as a nursing assistant in 2015.  (Tr. 41).  In that job, she would have to lift and carry up to 50 pounds.  (Tr. 41).  She received three weeks of specialized training, and she worked in that position for 10 years.  (Tr. 41).  Bragg said that she stopped working because her neuropathy got worse, she had panic attacks, she had abscesses, and her pituitary tumor got worse.  (Tr. 43).  Bragg said that she continued to have high blood sugar, which caused her to feel numb, off-balance, and "fuzziness" in her head.  (Tr. 43).  She said that

she also had kidney disease, Cushing's disease, and muscle weakness in her legs.  (Tr. 43).  She

took medications for her conditions and saw specialists for other new conditions.  (Tr. 43).

Bragg also said that her panic attacks prevented her from working and she would feel like she

couldn't breathe when she was around a bunch of people.  (Tr. 44).

       Kathleen Rice, a vocational expert ("VE"), also testified.  (Tr. 47-49).  The ALJ asked the

VE whether a hypothetical individual with Bragg's age, experience, and education could work if

she were limited to light exertion, except that:

> This person can occasionally operate foot controls bilaterally.  This person can
> occasionally reach overhead bilaterally.  This person can occasionally climb
> ramps and stairs, and occasionally stoop and crawl, but can never climb ladders,
> ropes, or scaffolds and can frequently crouch.  This person can never work at
> unprotected heights, near moving mechanical parts, and cannot engage in
> commercial driving.  This person can tolerate no more than occasional exposure
> to humidity and wetness, extreme cold and extreme heat.  In addition, this person
> is able to perform tasks with no strict production rate pace requirements. Can
> tolerate routine workplace changes and only occasional interactions with the
> public.

(Tr. 47-48).  The VE said that such an individual could not perform Bragg's past work as a

nurse's aide, but she could work as a merchandise marker, mailroom clerk, or housekeeping

cleaner.  (Tr. 48).  If the person described in the first hypothetical were limited to sedentary

exertion, she could work as a document preparer, addresser, or prep cooking cutter and paster.

(Tr. 48-49).  The VE also said that a person with an absence rate of one day per month or more

would not be able to sustain employment.  (Tr. 49).

## IV.  The ALJ's Decision

       The ALJ made the following paraphrased findings relevant to Henderson's argument on

judicial review:

> 5.  Bragg had the RFC to perform sedentary work, except that she was able to lift
> and carry 10 pound occasionally and less than 10 pounds frequently; stand or
> walk for 2 hours in an 8-hour workday; push and pull as much as she can lift

or carry; operate foot controls bilaterally occasionally; occasionally reach overhead; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; stoop occasionally; crouch frequently; crawl occasionally; never work at unprotected heights or around moving mechanical parts; never do commercial driving; occasionally be exposed to humidity, wetness, extreme cold, and extreme heat; perform tasks with no strict production rate pace requirements; occasionally interact with the public; and handle routine work changes. The ALJ "considered all symptoms" in light of the medical and other evidence. Objective medical evidence showed that Bragg had complained of pain, but she generally had normal gait, normal motion, full strength, and normal findings on CT scans. She complained of significant mental limitations, but objective medical evidence showed only recent treatment for stress related to her physical impairments and life situation. She told her physician that she had no social impairments, and her counselor noted that she had normal speech, thoughts, attention, concentration, and memory. Bragg also told Dr. Wax that she was not in counseling, had no psychiatric care, had no difficulty getting along with coworkers and supervisors when she was working. And Dr. Wax determined that Bragg had average intelligence, intact attention and memory, good social skills, and a pleasant demeanor. (Tr. 21-24).

Dr. Wax's opinion was given "partial weight" because he was familiar with program requirements, had the opportunity to examine Bragg, and his opinion was generally consistent with objective medical evidence available at that time. But Bragg had since started going to counseling, and the ALJ considered that evidence to form a more complete mental RFC evaluation. (Tr. 26).

Dr. Golembiewski's opinion was given "little weight" because she was not familiar with program requirements and her opinion was inconsistent with the objective medical evidence, including her own treatment notes. "Dr. Golembiewski noted normal physical findings and stated that she was unable to provide the claimant with pain medications. The objective medical evidence also shows generally normal physical findings, with normal gait and full strength. . . . [T]here is nothing in the objective medical evidence that would support the extreme limitations set out in this medical source statement." (Tr. 26).

Based on all of his findings and the VE's testimony, the ALJ determined that Bragg was not disabled from June 15, 2016 through the date of his decision. (Tr. 28).

21

V.      **Law & Analysis**

 A.      **Standard of Review**

  The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones*, 336 F.3d at 476.  And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our role to try the case de novo." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

  Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error

prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v.*
*Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review
decisions of administrative agencies for harmless error."). Furthermore, the court will not
uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical
bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D.
Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v.*
*Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant
evidence is not mentioned, the court cannot determine if it was discounted or merely
overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio
Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn.
July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D.
Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant, as well as a
reviewing court, will understand the ALJ's reasoning.

  The Social Security regulations outline a five-step process the ALJ must use to determine
whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial
gainful activity; (2) if not, whether the claimant has a severe impairment or combination of
impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals
any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant
can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the
claimant's age, education, and work experience, he can perform other work found in the national
economy. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc.*
*Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). Although it is the Commissioner's obligation to
produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient

evidence to prove that he is disabled and, thus, entitled to benefits.  20 C.F.R. §§ 404.1512(a), 416.912(a).

### B.     Weighing of Dr. Golembiewski's Opinion

Bragg argues that the ALJ failed to apply proper legal standards and reach a decision supported by substantial evidence when he gave "little weight" to Dr. Golembiewski's opinion. ECF Doc. 14 at 11-16.  Bragg asserts that the ALJ's reasons for giving Dr. Golembiewski's opinion "little weight" – that she was lacked program familiarity and her opinion was inconsistent with the objective medical evidence – were not "good reasons" for giving her opinion less than controlling weight.  ECF Doc. 14 at 12.  Bragg contends that no evidence in the record supported the ALJ's finding that Dr. Golembiewski lacked program familiarity and that the ALJ's inconsistency finding was based on a mischaracterization of the objective medical evidence (that Dr. Golembiewski was unable to provide Bragg with pain medication).  ECF Doc. 14 at 13-14.  Bragg also argues that objective medical evidence in the record *did* support Dr. Golembiewski's opinion, and that the ALJ did not adequately explain why he credited medical records that were inconsistent with the opinion over records that were consistent with it.  ECF Doc. 14 at 14-16.  Further, Bragg asserts that the ALJ's assignment of "little weight" to Dr. Golembiewski's opinion was not harmless because Dr. Golembiewski's opinion set out work-preclusive limitations.  ECF Doc. 14 at 16.

The Commissioner responds that the ALJ adequately explained that Dr. Golembiewski's opinion was due little weight because it was inconsistent with the objective medical evidence, which the ALJ had earlier described as reflecting generally normal findings on physical examinations.  ECF Doc. 16 at 14-15.  The Commissioner asserts that the ALJ's statement that Dr. Golembiewski lacked program familiarity and was unable to provide pain medications were

not the primary reasons the ALJ gave for discounting her opinion.  ECF Doc. 16 at 14-15.

Instead, the Commissioner argues that the ALJ's inconsistency finding alone was a good reason

for discounting Dr. Golembiewski's opinion.  ECF Doc. 16 at 15.  The Commissioner also

contends that Bragg improperly seeks to have this court reweigh Dr. Golembiewski's opinion.

ECF Doc. 16 at 15-16.  Further, the Commissioner asserts that the ALJ adequately accounted for

Bragg's physical impairments by providing extensive limitations in the RFC finding and that the

VE's testimony supported his ultimate "not disabled" finding.  ECF Doc. 16 at 16.

　　　In her reply brief, Bragg argues that the Commissioner's argument that inconsistency was

the ALJ's primary reason for discounting Dr. Golembiewski's opinion is an improper post-hoc

rationalization.  ECF Doc. 17 at 1-2.  Bragg also reiterates her argument that the ALJ

mischaracterized the evidence in his evaluation of Dr. Golembiewski's opinion and asserts that

she is not asking this court to reweigh the evidence.  ECF Doc. 17 at 2.

　　　At Step Four, an ALJ must weigh every medical opinion that the Social Security

Administration receives.  20 C.F.R. §§ 404.1527(c), 416.927(c).[3]  An ALJ must give a treating

source opinion controlling weight, unless the opinion is: (1) not "supported by medically

acceptable clinical and laboratory diagnostic techniques"; or (2) inconsistent with finding in the

treating source's own records or other medical evidence in the case record.  20 C.F.R.

§§ 404.1527(c)(2), 416.927(c)(2); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 786 (6th Cir.

2017).  And, if the ALJ finds either prong justifies giving the treating source opinion less-than-

controlling weight, she must articulate "good reasons" for doing so – *i.e.*, explain which prong

---

[3] On January 18, 2017, the Social Security Administration amended the rules for evaluating medical opinions for claims filed after March 27, 2017.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017).  Because Bragg filed her applications for DIB and SSI before March 27, 2017, the new regulations do not apply.  (Tr. 197-210).

justifies that decision.  *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); *Biestek*, 880 F.3d at 786.

If an ALJ does not give a treating physician's opinion controlling weight, the ALJ must weigh the opinion based on: the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, whether the treating physician is a specialist, the physician's understanding of the disability program and its evidentiary requirements, the physician's familiarity with other information in the record, and other factors that might be brought to the ALJ's attention.  *See Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).  Nothing in the regulations requires the ALJ to explain how he considered each of the factors.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *Biestek*, 880 F.3d at 786 ("The ALJ need not perform an exhaustive, step-by-step analysis of each factor."). However, the ALJ must at least provide an explanation for the ultimate weight assigned to the opinion.  *Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (acknowledging that, to safeguard a claimant's procedural rights and permit meaningful review, 20 C.F.R. § 404.1527(d)(2) (and § 416.927(d)(2)) require the ALJ to articulate good reasons for the ultimate weight given to a medical opinion).  When the ALJ fails to adequately explain the weight given to a treating physician's opinion, or otherwise fails to provide good reasons for the weight given to a treating physician's opinion, remand is appropriate.  *Cole*, 661 F.3d at 939; *see also Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (holding that the failure to identify good reasons affecting the weight given to an opinion "'denotes a lack of substantial evidence, even whe[n] the conclusion of the ALJ may be justified based upon the record.'" (citing *Rogers*, 486 F.3d at 243)).

26

The ALJ applied proper legal standards in weighing Dr. Golembiewski's opinion.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.  The ALJ complied with the regulations by explaining that he gave Dr. Golembiewski's opinion "little weight" because she was not familiar with program requirements and it was inconsistent with the objective medical evidence. *Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c), 416.927(c); (Tr. 26).  The ALJ's finding that Dr. Golembiewski's opinion was inconsistent with the objective medical evidence was a "good reason" for giving a treating physician opinion less than controlling weight.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Biestek*, 880 F.3d at 786; *Gayheart*, 710 F.3d at 376.  Even accepting that lack of program knowledge was not a "good reason" for giving a treating physician opinion less than controlling weight, it *is* a regulatory factor that an ALJ may consider in determining the ultimate weight an opinion should receive after the ALJ has determined the opinion is due less than controlling weight.  *See Gayheart*, 710 F.3d at 376; 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).  And the ALJ's inclusion of that finding – along with his explanation that Dr. Golembiewski's opinion was inconsistent with the objective medical evidence – fulfilled the ALJ's duty to provide an explanation for the ultimate weight given to the opinion in a manner that permits meaningful review.  *Cole*, 661 F.3d at 938.

Substantial evidence also supported the ALJ's decision to give Dr. Golembiewski's decision "little weight."  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.  Bragg is correct that no evidence in the record supported the ALJ's finding that Dr. Golembiewski lacked program knowledge.  Bragg is also correct that one of the ALJ's examples of Dr. Golembiewski's inconsistency – that Dr. Golembiewski noted Bragg became angry when she declined to give her medication – misstates the record, which demonstrates that: (1) Dr. Golembiewski's note was likely a restatement of Dr. Swalha's note making the same statement;

27

and (2) Dr. Golembiewski *did* prescribe medications.  (Tr. 335, 355, 1224-25, 1245, 1259).
Nevertheless, the ALJ's finding that Dr. Golembiewski's opinion was inconsistent with the
generally normal findings in Dr. Golembiewski's own treatment notes and other objective
medical records was more than sufficient to independently justify giving the opinion "little
weight."  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); (Tr. 26).  The record evidence supported
that finding, including: (1) regular findings that Bragg had a regular heart rate and rhythm,
normal range of motion, full strength, normal gait, normal sensation, normal breathing, no edema
in her extremities; (2) diagnostic imaging and lab work consistently resulting in normal findings;
(3) notes indicating that Bragg was cooperative, was fully oriented, had normal
behavior/mood/affect, had normal memory, had normal attention/concentration, had appropriate
thought content and organization, and responded well to therapy; (4) statements from providers
recommending physical therapy, diet, and exercise to resolve her symptoms; (5) her conservative
treatment with medication; and (6) Bragg's own comments to providers that her pain was "mild"
and relieved by narcotics.  (Tr. 335, 340, 343, 353, 356-61, 375, 378-79, 381-83, 385, 390-92,
394, 397, 399, 491-92, 496, 508, 671-72, 698, 719, 1096-97, 1101-04, 1230, 1259, 1379, 1419,
1421-22, 1493-96, 1603, 1626, 1632-36, 1642-43, 1646-48, 1652, 1673).  One misstated
example, in light of the ALJ's extensive summary of other record evidence and the existence of
other examples of how Dr. Golembiewski's opinion was inconsistent with objective medical
evidence, does not render the ALJ's finding unsupported by substantial evidence – even if other
evidence or a preponderance of the evidence could have supported a different conclusion.  *See*
*O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 476-77; *Rogers*, 486 F.3d at 241; *Biestek*, 880
F.3d at 783.

Because the ALJ adequately explained the weight he assigned to Dr. Golembiewski's opinion and because his finding that her opinion was inconsistent with objective medical evidence was reasonably drawn from the record, the ALJ's decision to give Dr. Golembiewski's opinion "little weight" fell within the Commissioner's "zone of choice" and cannot be second-guessed by this court.  *Mullen*, 800 F.2d at 545; *Fleischer*, 774 F. Supp. 2d a 877.  Accordingly, the ALJ's decision to give Dr. Golembiewski's opinion "little weight" must be AFFIRMED.

### C.      Weighing of Dr. Wax's Opinion

Bragg argues that the ALJ failed to apply proper legal standards in evaluating Dr. Wax's opinion because he did not explain why certain limitations were not incorporated into the RFC when he gave the opinion "partial weight." ECF Doc. 14 at 16-18; ECF Doc. 17 at 3. Specifically, Bragg asserts that the ALJ did not adequately explain why he did not incorporate into the RFC: (1) her need for "outside resources" (assistance and reminders) to "maintain herself;" and (2) her inability to respond appropriately to supervisors and coworkers.  ECF Doc. 14 at 17.  Bragg contends that the ALJ's failure to explain why he did not incorporate these limitations precludes meaningful judicial review and that evidence in the record supported Dr. Wax's opinion.  ECF Doc. 14 at 17-18; ECF Doc. 17 at 4 (explaining that the ALJ's failure to give such an explanation resulted in a failure to build a logical bridge between the evidence and the RFC).  Further, Bragg argues that, because these limitations were omitted from her RFC and the hypothetical question posed to the VE, the VE's testimony could not constitute substantial evidence to support the ALJ's finding that she was not disabled.  ECF Doc. 14 at 18; ECF Doc. 17 at 4.

The Commissioner responds that the ALJ applied proper legal standards and reached a decision supported by substantial evidence in evaluating Dr. Wax's opinion.  ECF Doc. 16 at 16-

19.  The Commissioner argues that the ALJ was not required to give any special deference to Dr. Wax's opinion or give "good reasons" for discounting it.  ECF Doc. 16 at 17.  Nevertheless, the Commissioner asserts that the ALJ adequately: explained that Dr. Wax's opinion was due only partial weight, explained that it was consistent only with moderate limitations, and gave significant deference to it in crafting the RFC finding.  ECF Doc. 16 at 18-19.  The Commissioner also contends that any error in the ALJ's evaluation of Dr. Wax's opinion would be harmless because the record shows that the ALJ considered Dr. Wax's examination and opinion, discussed the findings, and reached an ultimate RFC finding that was supported by substantial evidence.  ECF Doc. 16 at 17.

Unlike treating physician opinions, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  Instead, an ALJ must weigh such opinions based on: (1) the examining relationship; (2) the degree to which supporting explanations consider pertinent evidence; (3) the opinion's consistency with the record as a whole; (4) the physician's specialization related to the medical issues discussed; and (5) any other factors that tend to support or contradict the medical opinion.  *Id.*; 20 C.F.R. §§ 404.1527(c), 416.927(c).  An ALJ does not need to articulate good reasons for rejecting a nontreating or nonexamining opinion.  *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (declining to address whether an ALJ erred in failing to give good reasons for not accepting non-treating physicians' opinions).  Nevertheless, an ALJ must provide sufficient explanation for the claimant and any reviewing court to be able to "trace the path of his reasoning."  *Stacy v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011); *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 643 (6th Cir. 2013) (holding that an ALJ erred when he stated that an examining physician's tests were invalid without explaining why they

30

were invalid).  Even when an ALJ gives "great weight" to an opinion, the ALJ is not necessarily required to adopt all the limitations from that opinion.  *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).

The ALJ applied proper legal standards in weighing Dr. Wax's opinion.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.  Because Dr. Wax was not a treating physician, the ALJ was not required to provide "good reasons" for discounting the opinion.  *Smith*, 482 F.3d at 876.  Nevertheless, the ALJ adequately explained that he gave Dr. Wax's opinion "partial weight" because, although it was consistent with the objective medical evidence that was available *at the time it was issued*, the record showed that Bragg started counseling *after* Dr. Wax's examination and opinion and consideration of *that* evidence was required for a more-accurate RFC.  (Tr. 26).  This explanation was exactly the kind of analysis set out in the regulatory factors and it was more than sufficient for any reviewing court to track the ALJ's reasoning for not adopting all of the limitations in Dr. Wax's opinion.  20 C.F.R. §§ 404.1527(c), 416.927(c); *Stacy*, 451 F. App'x at 519; *Brooks*, 531 F. App'x at 643; *see also Reeves*, 618 F. App'x at 275.  While more explanation might have been helpful, a perfect written decision is not required.  *See Shkrabari v. Gonzales*, 427 F.3d 324, 327 ("'[N]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion . . .'" (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)); *accord Kobetic v. Comm'r of Soc. Sec.*, 114 F. App'x 171, 173 (6th Cir. 2004).  The ALJ's decision read as a whole is sufficient to draw an accurate and logical bridge between the evidence and the result.  *Fleischer*, 774 F. Supp. 2d at 877.  That's enough.

Substantial evidence also supported the ALJ's decision to give Dr. Wax's opinion "partial weight" and not to adopt Dr. Wax's outside-resources and supervisor/coworker-

31

interaction limitations.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.  Substantial evidence supports the ALJ's conclusion that Bragg began mental health treatment *after* Dr. Wax issued his opinion because the record shows that Bragg first began mental health treatment in April 2018 after Dr. Golembiewski referred her for counseling to address complaints that she had depression and anxiety due to relationship problems and her lack of housing.  (Tr. 1644, 1637-38).  Substantial evidence also supports the ALJ's decision not to adopt Dr. Wax's outside-resources and supervisor/coworker-interaction limitations, including: (1) Dr. Wax's own examination notes indicating that Bragg denied having any difficulty getting along with teachers, co-students, supervisors, and coworkers and determination that she had good social skills; (2) Counselor Anne Tyler's findings that Bragg was open to feedback and support and had normal thought process and content, cordial and cooperative behavior, thoughtful and logical judgment, normal recent and remote memory, appropriate expression, organized thoughts, and normal attention/concentration; and (3) treatment notes from other providers, including Dr. Golembiewski, indicating that Bragg was calm and cooperative and had normal behavior, mood, affect, judgment, thought content, and memory.  (Tr. 343, 355, 359-60, 383, 385, 394, 397, 1253-55, 1421-22, 1493, 1495, 1626, 1632-33, 16345-36, 1642-43, 1646, 1652).  And because substantial evidence supported the ALJ's reasons for discounting Dr. Wax's opinion and not including some limitations from it in the RFC, the ALJ's weighing of Dr. Wax's opinion and RFC assessment cannot be second-guessed by this court even if a preponderance of the evidence could have supported a different decision.  *O'Brien*, 819 F. App'x at 416; *Jones*, 336 F.3d at 477; *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783.

Because the ALJ applied proper legal standards and his decisions to: discount Dr. Wax's opinion and to omit Dr. Wax's outside-resources and supervisor/coworker-interaction limitations

from the RFC were reasonably drawn from the record, the ALJ's decision fell within the Commissioner's "zone of choice."  *Mullen*, 800 F.2d at 545.  Accordingly, the ALJ's decision must be AFFIRMED.

### VI.     Conclusion

Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Bragg's applications for DIB and SSI AFFIRMED.

**IT IS SO ORDERED.**

Dated: December 30, 2020

Thomas M. Parker
United States Magistrate Judge